Good afternoon, Your Honors. Christine Wilkes of Latham & Watkins, appearing on behalf of the City of San Diego, who is the petitioner and also the appellant here. May it please the Court, I think that my opponent, Insurance Company of State of Pennsylvania, has done an excellent job of turning a very simple duty-to-defend case into an analytic nightmare that threw the district court off track. Can you tell me how much money has been spent in defense? Yes, Your Honor. Approximately $4 million. Of that $4 million, and that would be, actually, it would be a little bit more than that, $4.5 million. And of that, $2 million approximately has been reimbursed by ISOP, as I shall call them. The other $2.5 million has been funded by the city. Can you tell me which policy or policies we're under? Yes, Your Honor. The first one is the 1991 to 1994 policy. How many occurrences under that policy? Well, Your Honor, ISOP alleges that there are multiple occurrences under that policy. Under that policy. Under that policy, yes. And I can ---- But the project wasn't opened until after that policy expired, right? The routing to the border started in January 1, 1995. However, the underlying complaint alleges that during the period of construction, the property was damaged, that access to the property was impaired. So the claim was made after the second policy was enforced. This is not a claims-made policy, Your Honor. It's an occurrence-based policy. Right. And it's alleged that property damage occurred during the policy period. And if the Court looks ---- All right. Then did damage occur ---- Then if that was the claim, did damage occur under the second policy also? Yes, Your Honor. How many occurrences have occurred? Well, there are three different claims. How many occurrences, as that's defined in the policies? Three, one, two, what? Your Honor, that really has ---- A hundred? That really hasn't been addressed by the parties below. I can tell you that ISOP alleges that there were more than one occurrence under each policy period. Perhaps I'm not understanding what the Court ---- Well, once you get $2 million, then the carrier has no further obligation under the second policy. That's not correct, Your Honor, because there's ---- it's a $4 million aggregate policy. And so if, as ISOP alleges, there are two ---- at least two occurrences, then the $4 million aggregate is implicated. What if they don't in one year? I don't think. If you read the policy language. Your Honor, there could be two occurrences happening in the same year, I believe. All right. And so there's two defenses, and they total a million dollars. I think that's the ---- or $2 million, that's the end of the line under the policy. And then in addition, ISOP also holds the excess layer directly above that, which is a $22 million policy. Has the district court made any findings about coverage as of today? No, Your Honor. As of the day you took the appeal? No. The only finding that's ---- Why did the district court enter a final appealable judgment? Your Honor, the district court denied the duty to defend, which is tantamount to an injunction, tantamount to denial of an injunction or certainly an order that has the effect of denying an injunction. If it's beyond policy limits, the denial is proper. Your Honor, I think we have to back up. And there are two policies, as you were asking at the outset. And that's right. And the first policy has a $7 million policy limit. So we're nowhere near ---- 91-94 policy. That's correct. It has $7 million. And then the 97-2001 policy has $2 million per occurrence. $2 million per occurrence. So a $4 million aggregate. That's correct. And then you said there's an excess coverage. Is that policy involved? Your Honor, it's our position that if there was exhaustion, as ISOP claims, that that would be completely irrelevant for two reasons. First of all, because ---- well, for several reasons. First of all, because there's also a duty to defend under the earlier policy. But secondly, because there's an excess layer that ISOP holds of $22 million that sits directly above that $2 million policy. I'm not really following why the 1991-94 policy provides coverage for De La Fuente's claim. He only claims damages for the damage to his property and inverse condemnation that took place while they were constructing the road, right? And that was during the policy period. And I could give you the ---- 91-94? Yes. And let me give you those sites, Your Honor, if I may, because I want to make sure that the Court has this in the record. Yeah, I need the site for that, because I'm under the understanding that he only claims damage in the second policy. I'm sorry? That he only claimed damages during the second policy. No, not at all. He claimed an ongoing inverse condemnation based on the routing of the trucks through and around the property. That commenced, according to the allegations, and I'll give you the sites. And you need to remember that the 91-94 policy runs all the way through August of 1994. There is alleged damage in the policy period, and the following sites will tell you that. SCR 120, which alleges that the construction began in mid-1998. Didn't he say the congestion began? But he doesn't say damages occurred then. Well, the damages flowed from the congestion, because the congestion, he says, in SCR 212, he talks about a seven-month period prior to the opening where the right of access was impaired. That's at SCR 212. The Court should also look at ER 91. When in 1995 did the Otay-Mesa border crossing open? It formally opened January 1, 1995. But according to the allegations of the complaint, as I said, there was blocking during the construction that prevented access and loss of use to the park during that policy period, dating back to several months before the border crossing opened. There's also, of course, the airport inverse condemnation allegation that's the subject of this lawsuit, and that ran from 19 — that alleged — allegedly ran from 1998 through 1993. So that would be directly during the policy period, and that allegedly caused a nuisance on the property during that policy period. I mean, I sense that the Court is struggling with the issue of whether there was — there are alleged occurrences. The only other issue that I'm struggling with when I put it out there is, at what point in time are you saying that ISOP had the duty to defend? Was it based on the complaint, or was it based on all this testimony that came out at trial? It was based upon the original complaint, at least as amended in December of 1998, because that's when the inverse condemnation allegations were added to the complaint. And you gave them timely notice of that? Yes, Your Honor. And it started to defend you. Well, we gave them notice prior to trial, formal notice three months prior to trial. There was actual notice as of 1997 based on the loss runs, and if the Court needs cites to the record on any of this, I'm happy to provide it. They waited until after the verdict, and they received notice of the verdict. They waited another eight months until August of 2001, and then agreed to defend under a reservation of rights. So at that point, they sent a letter saying that they would defend under a reservation of rights, which they have not done. They've done it on a stop-start basis, paying some defense costs but not defending for a lengthy period of time. All right. I just want to make sure that I sense that the Court, we're not on the same page. I mean, this seems to me to be a very simple duty to defend case when you look at the allegations of the underlying lawsuit. If the briefing had taken an event or a series of events and matched them up against the policy language, we would understand a little better what's going on. The briefing really doesn't talk about the policy very much other than one policy begins on one date and another policy begins on another date, and we want our defense costs paid. That's essentially the claims of the briefing. Well, I certainly apologize if that wasn't clear, but I think that the ‑‑ Well, no. I mean, there's no question but what the policies are available in the ER, and we go back and we start trying to read the things and trying to understand what's ‑‑ we don't have the claim forms, we don't have the correspondence, we don't have the letters, and that's why we're asking. Okay. Well, that helps me, Your Honor, and I appreciate that. I think that probably what's missing then is a sense that the Court doesn't have the information about the underlying lawsuits and what the allegations are of the specific claims and how they match up with the policy period. And when they assumed or didn't assume, and when they did perform and when they didn't perform, and how many occurrences are there? I don't know whether this is 25 dump trucks that went through there, each knocking over a fire plug in front of 25 different locations, or what the problem is. Right. Well, let me explain that. They can use the public road. I mean, you'll admit that. Right. And the nature of the claim, and, of course, we're focusing only on the allegations, not on what will be proven in the underlying lawsuit. It's a very unique factual circumstance. The Federal Government opened the port of entry in January 1, 1995. Prior to that, there was allegedly extensive construction around the property that ‑‑ where the city set up a route. And what you have to understand is the port of entry, and I know the Court's familiar with the port of entry, but it's only open for commercial traffic during a very few hours of the day. And so what happens is these tractor trailers line up allegedly for miles and miles, and they try to queue up around, and where the port of entry is, is right adjacent to the business park. And so they try to queue up around the park, and what happens is, according to the allegations, they're there, they're honking, they're making noise, they're smoking, they're blocking access to the park. And that's what the trial court found in the first trial was the basis for the inverse condemnation claim. And I don't see ‑‑ and that blocking allegedly occurred, as the sites I've given you indicate, during the policy period, both during the 91 to 94 policy period and during the 1997 to 2002 policy period. It's an ongoing, an allegation of ongoing damage, continuous damage, based on that harm during those ‑‑ that entire period. So every day there's another occurrence? Well, it depends on how you define occurrence. I mean, they define one occurrence as a series of related events, so presumably that would be one occurrence that would be a continuous occurrence. But we don't need to decide any of that here. All we're deciding is if there's ‑‑ or all you need to decide is if there's one potential occurrence that gives rise to a liability under the policy. And where the district court went astray is that it said, I don't think that the city can be liable in nuisance for routing traffic. Well, there's no way to know that because the underlying lawsuits are still going on. And Friends of H Street, which the court relied upon, the underlying plaintiffs are vigorously disputing that there's any basis for Friends of H Street to provide the city with immunity from nuisance. They're saying Friends of H Street doesn't apply, that the city violated the law, the city is in trouble for the manner in which it routed the traffic, that it was negligent in the manner of routing the traffic, and it hurt the property. It caused damages in the form of harm to rental value, and they're assessing the damages or measuring the damages as an easement measure, 10% per year for every year commencing with the beginning of construction and going all the way through the current time, even. So it easily encompasses all these policy periods. Does there have to be a potential claim for nuisance or trespass for there to be coverage? No, because there are two different bases for coverage. There's the personal injury, which would give rise to coverage for nuisance or trespass, and there's also the property damage, which rather than being an offense-based coverage, is an occurrence-based coverage. And that coverage would arise wherever there's an allegation of loss of use, which is precisely what's alleged here, or where there's an allegation of actual physical damage to property, which, of course, we also have here based on the carving roads across the traffic or across the property, the damage to landscaping, the damage to signs. But you contend also that there's nuisance or trespass. Alleged liability, absolutely. In fact, Judge Icola, who heard the post-trial motion, said this is absolutely a nuisance. I mean, he found it was a nuisance, of course. He ordered a retrial, and we're going back for retrial on that. And the other two cases, which make the same allegations, haven't even yet been tried. So the point is, under the courts, all the courts' case law, especially Anthem, Electronics, Reese, and the pension case, this is clearly a situation where there's a potential for indemnity. We don't know what the city's actual liability will be, but certainly there's an alleged nuisance, trespass, and property damage. Do the limits of liability of both policies cover, include the cost of defense, or do those go along? It's a burning limits type policy, so the limits do include. But, you know, there's certainly no basis for not finding a defense based on exhaustion because we have the two different policies, and the one, as I said, with a $7 million limit, that's nowhere near exhausted. The other with a $2 million per occurrence limit, but a $4 million aggregate limit, and you have ISOP itself admitting that there is at least more than one occurrence, and you have the $22 million excess policy with itself a defense obligation sitting right above it. Over both policies? Just over the later policy, the $2 million policy. Same insurer? Yes, ISOP. And while we have the break, so I don't take your time, I'll find a site to that excess policy. Is there anything else? Why don't you reserve your time? Thank you very much. James Waggoner, representing ISOP. I would like to respond to some of the questions I heard posed to counsel. First, I do not, I am not aware, and I've read the Sacramento complaint several times, of any allegation on the part of Mr. De La Fuente that the pre-border opening congestion was a cause for his damage. I don't think that's in the complaint anywhere. What there is in the complaint on page, the excerpts of record, page 0149, the city permitted the diversion of heavy truck traffic bound for the Otay Mesa border crossing. And then again on paragraph 39, the same reference is made. I went through this morning looking at the citations again from the brief of appellant, trying to refer to pre-1995 lack of access sites. Basically, none of them cite evidence. What they do cite, too, is the opening statements of counsel. Didn't that come out in the trial? I'm sorry? Didn't that come out in the trial as well? That there was congestion before? It was 1994 that caused damage. There was testimony from one of the experts that said, to his knowledge, there was congestion on La Media, I think is the name of the street. Right. But I mean, there was evidence of that in the trial. And if that's what gives rise to your duty to defend, it doesn't make any difference whether it's the complaint or the trial. You don't necessarily have to consider all the facts. But the question is, is that what Mr. De La Puente was complaining about? What the essence of it is, is what is the complaint about? Or what is the nature of the claim? Well, that would be true only if your determination as to whether you had a duty to defend stopped at the complaint. But as I understand it, the city kept you apprised of all the evidence that was coming in the trial. Well, we didn't even know it was a trial. We ordered a copy of the transcript later and read it. All right. We didn't know it was a trial. So you had that. And this is the thing that puzzles me about this case. You had this. You were aware of it. You started to defend. And then you stopped saying, oh, we're not aware of any damage? No. Not at all, no. You didn't start paying the cost of defense and then cease paying the cost of defense? We never ceased paying the cost. There was some administrative bill. Still paying? We're still paying today. You're doing it under reservation of rights? Correct, with the right to get it back, yes, Your Honor. Okay. Yes. There are a couple of things I think I can answer some of the questions that came. The money that's been spent on the defense so far, not all of it is owed by ISOP for a number of reasons. First, some of it is prior to the tender of defense. Secondly, some of it is the rates that are being charged for defense are not the rates that ISOP is obligated to pay. ISOP is obligated to pay rates that ordinarily pays under civil code. Is that a part of those issues? No. That's for later. But the $4.5 million question and the complaint is we're not paid at all. I'm trying to explain that that's why. All right. And that is in the record. The comment about one occurrence, the city contends in its brief that there is one occurrence. What the city refers to is the reference in the plaintiff's complaint that the verdict refers to multiple occurrences. That's a true statement because the verdict refers to two different instances of inverse condemnation. One is the announcement of the Twin Ports Airport. The second is the truck traffic diversion. Those would be two different occurrences. It's clear as a bell that the announcement of the Twin Ports Airport, there's nothing covered about that because it doesn't cause any property damage, doesn't cause any bodily injury. It's just an announcement. So although the jury awarded money for that particular invasion, there's nothing about it that's covered. So it's true that the complaint says two different occurrences just like it refers to there's also a breach of contract, for instance. And so the complaint accurately refers to multiple occurrences. That doesn't mean they're covered. The excess policy this House has referred to, I'm pretty sure the motion was made. I looked back at the motion this morning. The motion for summary adjudication was made only on the two policies that are referred to in the briefs, the 9194 policy and the 9701 policy. The excess policy is not referred to in the briefs, nor do I believe is in the record. The comment about loss runs, let me see if I can straighten this out if I can. First of all, actual notice was given to ISOP in October. The trial started in November. Notice did not say there was a trial in November. We first heard of the trial in January. At that point, the city had defended with the city attorney's office and had not exhausted their self-insured retention because the city attorney's fees don't count towards the SIR. In July, the city attorney's, the in-house city attorney's cost doesn't count towards exhausting the SIR. What's the SIR? The self-insured retention, I'm sorry. The one million. All right, so those aren't attributed. Those don't count. Okay. After the verdict, when they hired Latham and Watkins, then the fees do start counting. That's when you get up to the million. In July, it would be the July after the verdict, they notified ISOP that they had exhausted the $1 million self-insured retention, and within two or three weeks after that is when ISOP said they would defend. A very reasonable time. It's inaccurate to say that we were notified about this three years earlier or anything else with a duty to defend and did nothing. That's simply inaccurate. Excuse me. Well, they're not suing you for that, right? You're suing them. We have sued them for declaratory relief, correct. And I was just responding to those comments because those were comments made by counsel in response to questions from the court. But getting back to the fundamental issue here about whether it's a duty to defend at all, I think the confusion that the court has expressed about the briefing probably is a telltale sign about the fact that what the underlying De La Fuente case is about is not anything that they can bring within the policy's coverage. There are snippets, if you will. Lines taken out of context throughout. If you look at each of these excerpts of record that are cited, every single one of them does not indicate there was a covered injury during the policy period. What all these excerpts do indicate is that the plaintiff was suing for inverse condemnation. The references to the word nuisance are references that the plaintiff had to use in order to establish the inverse condemnation case under the law of inverse condemnation. There is no claim that there was any actual occupation by either the city or the truck drivers of the De La Fuente property. For that reason, there can't be personal injury. What about this ER 91? I think it's the testimony you were talking about where I guess it's I'm not sure who's really testifying. Is this the congestion? It says you'll learn a little more about the history of this truck diversion in order to route the traffic that way. Well, a lot of media wasn't set up. So in 1994, for about nine months, they literally blocked off the media up there. We see the little black bar and for the down below and literally routed all the trucks down off. And then it was blocked off there, isn't that? And they rerouted all the traffic, lasted nine months, both directions coming. And doesn't that give rise to nuisance or trespass or an inverse condemnation claim? Let me break that down. First of all, recall that there's a difference between trucks being on the street and trucks driving over dirt lots. Trucks being on the street is not a trespass at all, nor is it a wrongful entry. But they're saying that they were on the sides of the street. Not in 94, didn't they? Right. But that doesn't show an invasion. I don't think as I read that, I didn't hear that there were trucks driving across dirt lots in 1994. They were just congested. There's no trespass. There's no wrongful invasion. There's no property damage. What there is, is fumes, dust and noise. But the city can't be liable for that. One of the undeniable facts in this case is that the city is a city. Unlike a private business who can be liable for certain things, the city can't be liable for certain things. And when we look at duty to defend, it's not just a matter of connecting the dots. It's a matter of evaluating the nature and kind of liability that the plaintiff is seeking to impose on a city. But why can't the city be liable for that? For nuisance? Because there's a statute that says they can't be. OK. And then there's this other testimony about the congestion that says it was a temporary taking of property rights. That's it. You are one of eight. Does that have a date fixed to it? It's exhibit three. You are one of eight. Could I get a little. I believe this refers to the post 1995 congestion problems after the border was opened in 1994 to the present. The congestion has been going on since 94. This particular page is what I got from all this testimony, which was it was the trial testimony was that there was congestion. There is this fighting. They were taking over the property that checkers were in line. They couldn't deal up when they couldn't have access to his property. Called it a taking. When it comes when it comes. I really think there has to be a distinction because if it were a private business that did all those things, you might say, well, gee, there's some liability there. The city's immune. And when when there's an immunity, the city can't be sued. You know, there's this test that the court announced in the anthem electronics case. Look, any conceivable theory. Well, conceivable theory is a legal question. This is why they have judges decide duty to defend. And so we have to evaluate is, in fact, is there, in fact, a duty to defend for that stuff? And what what the complaint, in essence, says that they look like a blade is there's an economic loss here. Mr. Delacroix is not seeking sixty five million dollars for four trucks driving across property. That's not the essence of this complaint. That's not the gravamen. And the law is very clear. What California courts have been saying for the last several years is in these economic loss cases, you look at the gravamen of the complaint and this. Sorry, I was sort of question. I don't want to go back to a very basic thing that confused me. What you said, you said you're now continuing to pay the. I'm because here's what happened. The the ninety one ninety four policy we contend did not have a duty to defend provision at all. Judge Miller disagreed. He said that policy has a duty to defend provision based on that. That he says there's a duty to then provision in it. We have said, OK, even though we've exhausted the two million dollar policy for the ninety seven ninety one, based on the fact that he says there's a duty to defend provision as a matter of caution consistent with how we've handled all along. We should defend that policy subject to our right to get it back. If we can prevail and convince this court, we have no duty to defend. But we're doing what the court suggests. I mean, the courts give the insurers the option of paying to avoid excess liability. What's the right to get it back? And ISOC has taken advantage of that right to do so under reservation rights without hopefully any hint that they, that they subjectively think there's a duty to defend because they don't. There's a ninety four million dollar judgment out there and caution dictates that you handle it delicately. And so they've done that. And yes, they have paid money with the right to get it. But we may never get it back from the city. But the fact is that that's that's what's happened. Despite this decision in the partial summary judgment, you still continue. Yes, Your Honor. We felt that after. How are they being injured at this point? We don't believe they are, Your Honor. That's their contention. I suppose, without trying to put words in their mouth, they would contend that they're being underpaid. And we have a disagreement with that. That's not before the court. So you're paying only in part? We're paying what the law requires that we pay, Your Honor. What the law, assuming there's a duty to defend, Civil Code 2860 says an insurer owes no more in the payment of defense costs than what it would pay if it hired its own panel counsel in that area. So the rates that we're paying, the latest we want confirmed, are the same rates that ISOC would be able to hire its own counsel on. And that's the difference. So the inverse condemnation claim, could the city be liable for that? I'm sorry? If there's a claim, there's a potential claim for inverse condemnation, can the city be liable for that? The city can be liable for inverse condemnation. And as to the 9701 policy, there's a clear exclusion for that. As to the 9194 policy, there's an exclusion that says, with the exception for claims brought on the theory of negligence, and there is no claim brought on the theory of negligence for that kind of recovery. The exception exclusion is very specific, brought on the theory of negligence. And you can look through this complaint. There is no cause of action brought on the theory of negligence for that recovery. There is a negligent interference cause of action, but it has nothing to do with the traffic diversion. And so it is true that one has to weave their way through this if you get past, if you decide that we're going to. I agree with Judge Beasley. It would have been nice if someone weaved their way through the chart or something. There is a coverage chart that shows the whole thing, by the way. But the dates of the claimed occurrences. Well, and both counsel for the city and our firm believe we've done the best we can within the page limits that we had to present the case to the court. Like the last case that was here, they asked for about 20 extra pages, and it was granted by the clerk in San Francisco. You know, if you have a problem with briefing or you have some charts or exhibits, I have seen them presented at oral arguments, and we'll take the charts and exhibits that you want to present. So I will. From a practice prerogative, you can. You're trying to get a message to us. We didn't try the case. We're not participating in the settlement or the administration of the case. We're trying our darndest to exactly understand precisely the facts and then to apply the law to those facts. So that's what we're here for. And it's very difficult in this case. I don't know. It just takes a lot of reading. It may be that one of us is going to have to write this, and we're going to go get the whole record from the district court and read it from top to bottom to try and get a better handle on what we're dealing with. It's very difficult. Certainly no objection. They have different policies. They have different provisions. They have different limits. They have different dates. They're not interrelated in some respects, and in others they are. And we try to address all of this at oral argument. It's been awfully difficult to prepare for this. Your Honor, this is an involved case. I made the comment in the brief that I didn't think it was a closed case, mainly because of the principle proposition that what Mr. De La Pena is really seeking is economic loss. In the California cases, both for personal injury and property damage, the recent cases have all made it clear that if it's purely economic loss, it's not within the property damage or personal injury provision of the policy. That's right. But as I understood it, it was more than just his loss of business revenue. It was compensation for the damage to his property. And that was not alleged in the complaint. I agree with you. The complaint itself does not give rise to coverage. But in the, what was it, however many thousands of pages of transcript, those things were all discussed, and that's the part that makes it difficult. I would urge the court to do exactly what the court has done with this excerpt of the record and read that particular one. And bear in mind, every time you look at one of these excerpts, ask the several questions that you have to ask to fit it within the policy. Just because it talks about congestion, that doesn't mean the city is liable for congestion. There has to be, according to them, some kind of trespass or interference with occupancy. The reference to congestion does not show an interference with occupancy. That's on public roads. And then you took. See how a creative lawyer could create a claim for liability based on those facts, right? For nuisance?  Civil Code 3482. They're not liable for nuisance anyway. I'm sorry? They're not liable for nuisance anyway. They're liable for nuisance. Because they're a city. They can't deny the fact that they're a city. They can't become a non-city for purposes of insurance coverage. We insured a city, and the premium was calculated based on the fact the city has a number of defenses. The city is not liable for nuisance. And for that reason, I'm sure there's a discount that some actuary far smarter than I has figured out and put it in there. And for those reasons, we can't sit here and take a policy that the city has purchased that doesn't cover inverse condemnation and say that it suddenly applies to something with it not being sued for it It's because the plaintiff's lawyers have used the word nuisance to try to create the inverse condemnation liability. That's really what's happening. They're trying to shoehorn this thing. De La Fuente's testimony himself, he said that the city caused heavy commercial truck traffic to physically invade voters' property. It seems like the case didn't strictly adhere to the causes of action alleged in the complaint. It kind of got out of hand. No, I think what you're reading is testimony that it, in context, deals with those causes of action. And it just sounds like, gee, some other, the comment was maybe a creative lawyer could do this and create some cause of action there for causing trucks to enter. Judge Miller and myself included respectfully disagree. There's a couple reasons. The city, if the city sends its own employee across there in a truck, I agree, that city is trespassing. There's no allegation the city did it. The allegation is the city, by its truck traffic diversion, in essence, indirectly causes, because truck drivers are getting mad, they want to go somewhere, and they drive across a dirt lot to get somewhere. The city is not liable for that conduct. Nor is someone trying to hold the city liable for that, except for inverse condemnation, for which there's an exclusion. You can't sit there and say that the city is liable because some trucker took off on the dirt and so we're going to try and sue the city for that just because the city put up a boundary. The city has immunity for that kind of stuff unless it's inverse condemnation. And if it's inverse condemnation, that's excluded. So the jury came back with a verdict. What causes of action did it? Breach of contract and inverse condemnation. The breach of contract, there's no, I agree, if breach of contract results in property damage or personal injury, there's no question it's covered. It didn't. The breach of contract was purely the development agreement and had nothing to do with this truck traffic diversion stuff. The only time the truck traffic diversion came up was part of the inverse condemnation. And forgive me for repeating it, but for which we have an exclusion. Okay, counsel, that's the end of the time allotted for argument. Thank you very much for your time, Your Honor. Thank you. Your Honor, this is obviously a very important case to the city, and it's regrettable that we're addressing it so late in the briefing or in the argument when we're all a little bit tired, but I'll do my best. First of all, the point that the city can't be liable for nuisance, and that's what's so frustrating about this, because I have to stand up here as the city's lawyer in the underlying case and tell you why the city can be liable for nuisance, which sabotages my client's own defense in the underlying case. This is exactly why the rules on the duty to defend take the extrinsic evidence and the potential for indemnity in the complaint, and they look at it in the abstract, and they don't have the court pre-litigate or stand in the shoes of the judge and the jury in the underlying case. Is the city liable for all the emissions that are cast off of I-5 through the city of San Diego because it's a nuisance? Absolutely not, Your Honor. What's wrong with just a dirt road to an entry? What's the nuisance about that that's not a nuisance on I-5? I don't want to argue against my client's own interest in the underlying case, but I will because I have to to get coverage. I'm being forced to do it at the instance of my own defense, my client's own supposed ally in this litigation. In Friends of H Street, it's against the city of Sacramento. The court says that cities can be liable for nuisance. They can also be liable for inverse condemnation. They said on those particular facts they were not because the city, there was no allegation there that the people along the street were treated just like the people along I-5 were treated any differently than all the other residents around. Where you get inverse, where you get potential liability is where the city acts unreasonably towards an individual so that they're singled out and forced to bear more than their burden, more than they should have to bear, as opposed to anyone else. That's when a city can be liable. Friends of H Street recognizes that a city can be liable for the manner in which it routes traffic, that it can be. And all of this is hurting my client, but probably play this back in opposition to or in support of a motion for summary judgment in the underlying case. That's why we don't pre-litigate these cases. That's why we just look at the allegations. And that's exactly what ISOP would like you to do is to say, no, the city won't be liable. Well, we can't know that until the underlying case is over. And that's why they have to provide a defense. I agree with Judge Wardlot. And this case has been, you have to understand what it's like to litigate against Roque de la Fuente. It's a moving target. This case has been very different from the time the complaint was filed all the way through the current situation where we're litigating two copycat cases as well as retrying the existing case. And what the court should know is they try to minimize this as an economic damage case where the truck routing is a very small part. The single largest part of the damages. At this point, over $55 million in damages arise out of this that the court has found. Judge DeFelia found it. Judge Aicola affirmed it, that there was an impairment of access. We think it's wrong. Absolutely. But we're entitled to a defense to try to fight that liability. But $55 million in damages to Border Business Park based upon the fact that those trucks were routed around the park and went around the park and allegedly damaged plaintiff's property, preventing him from doing business. The damage, and this is back to Judge Fieser's occurrence question, and it's also back to the fundamental issue. We don't know how many occurrences there will be because the underlying facts aren't resolved. Once the underlying facts are resolved, then that's an indemnity-type issue. All we know now is that there's a potential for an occurrence. And remember that only the property damage and the personal injury coverages are occurrence. I mean, the property damage coverage is only an occurrence-based coverage. The personal injury coverage is a status or offense-type coverage. And so if there's an alleged nuisance during the policy period, if there's an alleged trespass during the policy period, then those give rise to a potential for indemnity. Can you explain, just to me at least, if your opposing counsel seems to say that they are paying the cost of defense and the only difference is what the rate should be? Yeah. I'm very glad you asked about that, Your Honor, because it goes back to a point that I was going to make in the opening argument. This insurer's conduct is reprehensible in this case, and I'll tell you why. AIG was a party to the Montrose v. Superior Court case. AIG knows it has a defense here. It sent a letter to the city accepting the defense under a reservation of rights. It has paid the defense on an ongoing basis. It's arguing to Your Honors that the policies have been exhausted. Well, if there was no duty to defend, why would they have exhausted the policies? They're trying to shield themselves from bad faith liability by doing just as much as they have to to protect themselves on the defense. By paying in fits and starts, they concede, basically, that they have a defense obligation. The reason that I say it's outrageous what they've done, if the Court looks at ER 395, that's the Terci declarations. That's AIG's own claims handler. She lays out in there the dates of payments of the defense costs, and it's ER 395. It's kind of a hard chart to read, but if you look at it, you'll see, look at it carefully, you'll see that under penalty of perjury, she says that they paid defense costs up through February 2002. Then they stopped paying. They paid no invoices whatsoever for almost a year and a half until July of 2003. This is when we're doing the critical post-appeal briefing in the case. So they're paying partially. There's been over $2 million in defense costs outstanding that have been unreimbursed for several years. So they're paying in fits and starts. They're paying partially. They're saying they don't have a defense, but they're defending. And all of that is because it's clear under the law that there's a potential for indemnity. There's an allegation of nuisance. There's an allegation of trespass. There's allegations of property damage, both of the physical type and the loss of use. There's a finding by the Court of a loss of access resulting in inverse condemnation. And, of course, there is an absolute inverse condemnation exclusion in one of the policies. The other policy has an exception for negligence. There are all kinds of allegations, and we've cited them in our brief, and I'm happy to cite them again to the Court, of negligent, unreasonable conduct by the city in routing the traffic. So when you take the very generous test of a potential for indemnity, there's simply no way that there can't be a duty to defend, and ISOP's own conduct belies their position that there's not. So I think we're considerably over your time. Thank you. The only offer that I wanted to have bankruptcy protection yet, does it? I'm sorry. No, but that's certainly we're very close to that. And it certainly shows the need for the defense in this case. If it would be helpful to the Court, and I really do apologize, we pride ourselves on our briefs, and I'm embarrassed that it was not helpful to the Court in the way that it should have been. And we're more than happy to submit, and I know the last thing you want is more briefing, but we're more than happy to submit some very short supplemental briefing addressing the exact issue of the timing of the occurrence. All right. So if we need any more briefs. Thank you very much for your time. Thank you very much. Thank you. Thank you both very much. The case is arguably submitted. The Court will stand in recess until the day. All rise. This Court is in a second session.
judges: Reinhardt, Beezer, Wardlaw